IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| EDWARD E. VEARD, JR., | ) | |
| | ) | Case No. |
| Plaintiff, | ) | |
| | ) | Judge |
| v. | ) | Magistrate Judge |
| | ) | |
| F&M BANK, | ) | Jury Demand |
| | ) | |
| Defendant. | ) | |

## COMPLAINT

For his Complaint against Defendant F&M Bank (F&M), Plaintiff Edward E. Veard, Jr., states:

### PARTIES

1. Plaintiff Veard is a citizen and resident of Goodlettsville, Davidson County, Tennessee, and a former employee of F&M.

2. Defendant F&M is a Tennessee corporation with its principal place of business in Clarksville, Tennessee, and doing business throughout Middle Tennessee, including in Davidson County, Tennessee. F&M may be served with process through its registered agent, John Wallace, 50 Franklin Street, Clarksville, Tennessee 37040-3436.

### JURISDICTION AND VENUE

3. This is an action for retaliatory discharge from employment brought under the Consumer Financial Protection Act of 2010 (Section 1057 of the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010), 12 U.S.C. § 5567 (CFPA), and Tennessee common law. The Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367(a). Venue is proper under 28 U.S.C. § 1391.

4. Mr. Veard has met all conditions precedent to the filing of this complaint. He timely filed a complaint with the U.S. Department of Labor – Occupational Health and Safety Administration on July 14, 2014. 210 days has passed since the filing of that complaint and the Secretary of Labor has not issued a final order; thus, Mr. Veard files this complaint in this Court with the permission of the DOL/OSHA and as of right pursuant to 12 U.S.C. § 5567(c)(4)(D).

**FACTS**

5. Mr. Veard worked for F&M as a mortgage originator from June 2, 2010, until F&M discharged him on January 17, 2014.

6. Mr. Veard performed his job for F&M in an excellent manner. He never received any disciplinary action during his employment with F&M.

7. In or about October 2013, F&M's compliance officer, Amanda Dean, and its Operations Manager, Denise Alexander, held a meeting with F&M's mortgage originators and loan processors at F&M's Hendersonville, Tennessee, branch office where Mr. Veard worked.

8. During the meeting, Mr. Veard inquired as to whether F&M was sending Adverse Action Notices to individuals whose loan applications it denied, as required by the Equal Credit Opportunity Act, 15 U.S.C. § 1691, *et seq.* (ECOA), and applicable regulations.

9. Ms. Dean responded to Mr. Veard's inquiry by stating, "We are supposed to be sending those out."

10. Following the meeting, Mr. Veard expressed his concerns to Ms. Alexander about F&M's repeated failure to send these Adverse Action Notices and asked her what would happen if it were discovered that F&M had not been doing so.

11. Ms. Alexander appeared angry that Mr. Veard had spoken out about F&M's failure to send required Adverse Action Notices and stated to him, "That would not be good."

2

12. Mr. Veard's supervisor, Hendersonville branch manager Brian Maggart, placed Adverse Action Notices in files that he knew or believed would be audited to make it appear that F&M had been sending the notices to denied applicants when, in fact, it had not done so. Mr. Veard expressed his concerns to and questioned Mr. Maggart about this practice but Mr. Maggart refused to correct it.

13. On or about November 1, 2013, Mr. Veard received a mortgage loan application from husband and wife customers named Spears.

14. Mr. Veard put the Spears file together and submitted it to a processor at F&M, Susie Ellis, who submitted it to an underwriter, Kathy Pachachi.

15. Ms. Alexander advised Ms. Pachachi that the Spearses' application should be denied due to an alleged foreclosure against Mr. Spears.

16. On or about December 10, 2013, JP Morgan Chase Bank (Chase) sent Mr. Veard an email stating that it would purchase the Spears loan.

17. Ms. Alexander called Chase and falsely advised or indicated to it that F&M had a Form 1099-C showing that Mr. Spears was personally responsible for the alleged foreclosure.

18. Chase then stated that it would not purchase the Spears loan.

19. F&M actually had a Form 1099-A indicating that "the borrower" was responsible for the alleged foreclosure. Mr. Spears was not the borrower. A Limited Liability Company (LLC) was the borrower.

20. Mr. Spears had been a minority partner in the LLC, which was dissolved in June 2012. The LLC was for a resort that Mr. Spears' parents had purchased with a loan in their (his parents') names only. Mr. Spears was not a guarantor of that loan nor was his name on the deed for the property.

3

21. After learning from Ms. Pachachi that the Spearses' loan application was going to be denied, Mr. Veard called Ms. Alexander and explained the above facts to her and explained that there had been no foreclosure against Mr. Spears. Mr. Veard further advised Ms. Alexander that he had received documentation from BancorpSouth, the bank that had executed the foreclosure, and the Spearses' Certified Public Accountant demonstrating as much.

22. Mr. Veard opposed, communicated and refused to remain silent about Ms. Alexander's denial of the Spears loan application for a false, inaccurate and/or illegal reason and asked her how F&M could deny it based upon a foreclosure against Mr. Spears when there was no foreclosure against him. Mr. Veard stated that he believed that F&M could be subject to liability for denying a loan based upon a false, inaccurate and/or illegal reason.

23. Mr. Veard also opposed, communicated and refused to remain silent about the fact that F&M had not been sending the required Adverse Action Notices to denied applicants and advised Ms. Alexander that he believed that this failure could subject it to liability, as well.

24. Ms. Alexander was angry and upset at Mr. Veard for opposing, communicating and refusing to remain silent about the denial of the Spearses' loan application for a false, inaccurate and/or illegal reason and F&M's failure to send out required Adverse Action Notices.

25. In mid-December 2013, F&M through Ms. Alexander denied the Spearses' loan application based upon an alleged foreclosure against Mr. Spears.

26. Mr. Veard requested a copy of the denial notice or Adverse Action Form from Ms. Pachachi so that he could see the reason that F&M was stating for the denial of the Spearses' application. Ms. Pachachi provided him a copy.

27. Mr. Veard then contacted Ms. Dean and reviewed the Spears file with her. He informed her of the documentation that F&M had received from the foreclosing bank and from

4

the Spearses' CPA demonstrating that Mr. Spears had not been foreclosed upon, was not liable for the note securing the LLC's property, and was not responsible for the foreclosure.

28. Mr. Veard further communicated to Ms. Dean and refused to remain silent about the fact that he believed that it was illegal to deny the Spearses' application based upon a false, inaccurate and/or illegal reason. Mr. Veard reasonably believed that F&M was required by the Truth In Lending Act, 15 U.S.C. § 1601, *et seq.* (TILA), and applicable regulations, and the ECOA, among other laws, to state a true and correct reason for the denial. Mr. Veard further reported to Ms. Dean that F&M was required to provide the Spearses an Adverse Action Notice within 30 days of the date of their application stating a true and correct reason for the denial. He also asked her if he should contact F&M's corporate attorney about the matter. Ms. Dean stated that he should not involve the attorney.

29. Mr. Veard also communicated to Ms. Dean and refused to remain silent about the fact that F&M had not been sending required Adverse Action Notices to individuals whose loan applications it had denied. Mr. Veard reasonably believed that F&M was required by federal law to do so.

30. Ms. Dean acknowledged to Mr. Veard that F&M should have been sending Adverse Action Notices and that it was a violation of the law for it not to have done so.

31. Following Ms. Alexander's denial of the Spearses' loan application, Mr. Spears asked to speak to her about the reason for the denial. Mr. Maggart advised Ms. Alexander that Mr. Spears wanted to speak to her about it.

32. On or about December 20, 2013, Ms. Alexander spoke to Mr. Spears about the denial of the loan and advised him that F&M would submit the file to U.S. Bank to see if it

5

would underwrite the loan and advised him that if U.S. Bank would approve the loan, F&M would close it for him.

33. Mr. Spears advised Ms. Alexander that he would speak with his wife and get back with F&M about submitting their file to U.S. Bank.

34. In late December 2013 or early January 2014, Mr. Veard asked Ms. Alexander and Mr. Maggart if he could submit the Spearses' file to Wells Fargo to see if it would purchase the loan. Mr. Maggart advised him that he could do so.

35. On or about January 10, 2014, Mr. Veard submitted the Spearses' file, including documentation related to the foreclosure and the LLC, to Wells Fargo. Later that same day, Wells Fargo confirmed that the foreclosure was not a personal foreclosure against Mr. Spears and further advised Mr. Veard that it would purchase the loan.

36. Mr. Veard informed Ms. Alexander and Mr. Maggart of these facts and asked them if he could proceed with closing the Spears loan and sending it to Wells Fargo for purchase.

37. Mr. Maggart advised Mr. Veard that Ms. Alexander had advised him (Mr. Maggart) that she would not approve the loan unless one of F&M's investors did the underwriting on it.

38. In late December 2013 and/or early January 2014, Ms. Alexander and Mr. Maggart encouraged Mr. Veard to submit the Spearses' file to U.S. Bank, one of its investors, for underwriting and to see if it would approve the loan.

39. In early January 2014, Mr. Spears advised Mr. Veard that he and his wife had talked and wanted him to submit their loan application to U.S. Bank.

40. Mr. Veard submitted the Spears file to U.S. Bank around January 15, 2014. He did so at Mr. Spears' request and with Ms. Alexander's and Mr. Maggart's knowledge and

6

permission. Upon the submittal, Shea Rapheal, an F&M shipper, received an email confirming the submittal.

41. U.S. Bank conditionally approved the Spearses' loan application.

42. On January 16, 2014, Ms. Alexander complained to her supervisor, DeWayne Olive, about Mr. Veard's communications with her and others about the Spears loan and recommended that Mr. Veard be discharged.

43. Without speaking to anyone other than Ms. Alexander in one phone call and without reviewing any documentation related to the Spears loan or the conditional approvals and denial of it, Mr. Olive approved Ms. Alexander's recommendation that Mr. Veard be discharged during their one phone call. Ms. Alexander was the individual principally responsible for Mr. Veard's discharge. Indeed, she was the source of the information communicated to and withheld from Mr. Olive. Further, Mr. Maggart told Mr. Veard on January 17, 2014, that it was Alexander's decision to discharge him and that he disagreed with the decision.

44. On January 17, 2014, Mr. Olive went to F&M's Hendersonville branch office and terminated Mr. Veard's employment. Mr. Olive stated to Mr. Veard that he was being discharged for "questioning F&M's underwriting of loans" and alleged "insubordination" to Denise Alexander.

45. When Mr. Veard asked Mr. Olive what he meant by "insubordination," Mr. Olive stated that Mr. Veard had continued to work on the Spears file after being told several times not to do so.

46. Mr. Veard advised Mr. Olive that he had never been told to stop working on the Spears file. He advised him that it was his job to attempt to make loans work and get them closed. Mr. Olive responded to Mr. Veard, "Well, it's just best we part ways at this point."

7

Case 3:15-cv-00498   Document 1   Filed 04/29/15   Page 7 of 11 PageID #: 7

47. F&M never notified the Spearses that U.S. Bank had approved their loan.

48. F&M never sent the Spearses an Adverse Action Notice following its denial of their loan application and its interference with U.S. Bank's conditional approval of it. The Spearses went on to promptly obtain their loan from Academy Mortgage, a competitor of F&M's in Hendersonville, with Wells Fargo purchasing the loan from it just as it had advised Mr. Veard it would do for F&M.

49. Mr. Veard did not engage in any "insubordination" with respect to the Spears file or at any other time during his employment with F&M. His "questioning" the reason for the denial of the loan and repeatedly expressing concerns and providing documentation about the legality of the denial was legally protected activity.

50. The reason F&M stated for Mr. Veard's discharge on the Tennessee Department of Labor and Workforce Development (TDOL) Separation Notice it issued for Mr. Veard on January 16, 2014, was "insubordination."

51. F&M later changed and added to its alleged reason for discharging Mr. Veard and advised the TDOL that he had violated an alleged "company policy" in addition to being "insubordinate" to Ms. Alexander by communicating with her and others about his concerns about the denial of the Spears loan.

52. No one at F&M ever told Mr. Veard that he had violated any company policy or that he was being discharged for doing so, including Mr. Olive when he explained the alleged reason for the discharge to Mr. Veard in response to Mr. Veard's request for an explanation.

53. F&M's shifting and expanding justifications for discharging Mr. Veard are false and are pretexts for unlawful retaliation.

54. Mr. Veard was not insubordinate in continuing to work on the Spears file. Nor did he violate any alleged company policy. Rather, he had Ms. Alexander's and Mr. Maggart's permission to continue working on the Spears file and they encouraged and advised him to continue submitting the file and they continued to work on it with him and Mr. Spears. F&M never told Mr. Veard to stop working on the Spears file.

55. F&M never warned, reprimanded, disciplined or addressed Mr. Veard about any alleged insubordination or any alleged violation of company policy before it discharged him.

56. F&M's alleged reasons for discharging Mr. Veard did not actually motivate his discharge. His reporting, opposing, communicating and refusing to remain silent about F&M's underwriting/reason for denying the Spears loan for what he believed to be a false, inaccurate and/or illegal reason and about its failure to send Adverse Action Notices as required by law motivated his discharge.

57. F&M's alleged reasons for discharging Mr. Veard are also legally insufficient to motivate his discharge. Other similarly situated employees who have engaged in far worse alleged conduct, such as alleged illegal sexual harassment, were issued warnings and disciplinary action for their alleged misconduct and were not discharged. Additionally, other employees continued to work on the Spears file at the same time and in concert with Mr. Veard and Mr. Spears, including Mr. Maggart, and were not discharged for doing so.

58. F&M discharged Mr. Veard in retaliation for reporting, opposing, communicating and refusing to remain silent about illegal activity, including (1) F&M's denying the Spearses' loan application based upon a false, inaccurate and/or illegal reason, in violation of the TILA, the ECOA, and other applicable laws and regulations and/or (2) its failure to send Adverse Action Notices to individuals whose loan applications it denied, as required by the ECOA and

9

applicable regulations. F&M's conduct in discharging Mr. Veard violated the CFPA and Tennessee common law.

59. F&M's retaliatory conduct as described in this complaint was intentional, reckless, malicious and/or fraudulent, entitling Mr. Veard to punitive damages under Tennessee law.

60. As a result of F&M's conduct as described in this complaint, Mr. Veard has lost income and other privileges and benefits of employment; suffered embarrassment, humiliation, emotional distress, anxiety, inconvenience, damage to his professional reputation, and loss of enjoyment of life; and has incurred attorney's fees, costs and litigation expenses.

## PRAYER FOR RELIEF

WHEREFORE, premises considered, Mr. Veard respectfully requests that judgment be entered in his favor and further requests:

1. A jury trial;

2. Back pay and benefits in an amount to be determined by the jury;

3. Front pay and benefits in an amount to be determined by the jury;

4. Compensatory damages for embarrassment, humiliation, emotional distress, anxiety, inconvenience, damage to reputation, and loss of enjoyment of life in amounts to be determined by the jury;

5. Punitive damages for retaliatory discharge from employment in an amount to be determined by the jury;

6. Attorney's fees, costs and litigation expenses in amounts to be determined by the Court;

7. Prejudgment interest and, if applicable, post-judgment interest in amounts to be determined by the Court; and

8. Such other and further legal or equitable relief to which he may be entitled.

Respectfully submitted,

Douglas B. Janney III (BPR No. 19112)
Law Office of Douglas B. Janney III
2002 Richard Jones Road
Suite B-200
Nashville, Tennessee 37215
(615) 742-5900

Attorney for Plaintiff