# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| EDWARD E. VEARD, JR., | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| v. | ) | **Civil No. 3:15-CV-0498** |
| | ) | **Judge Aleta A. Trauger** |
| | ) | |
| F&M BANK, | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM

Defendant F&M Bank ("F&M") has filed a Motion for Summary Judgment (Docket No.
22), to which plaintiff Edward E. Veard, Jr. ("Veard") has filed a Response in opposition (Docket
No. 43), and F&M has filed a Reply (Docket No. 44). For the following reasons, the motion will
be granted.

## FACTS AND PROCEDURAL BACKGROUND[1]

This case involves allegations by Veard that F&M improperly discharged him in
retaliation for complaining about illegal activity in the bank's mortgage business. F&M is a
Tennessee corporation with a principal place of business in Clarksville, Tennessee that does
business in Davidson County, Tennessee. Veard is a resident of Davidson County, Tennessee.

F&M is a correspondent lender. It makes lending decisions and initially funds a loan with
its own assets. As soon as the loan closes, however, F&M sells it to a larger mortgage lender
(*e.g.*, Chase, Wells Fargo, and U.S. Bank), called an "investor," at a previously locked-in interest

---

[1] Facts are drawn from F&M's Statement of Undisputed Material Facts (Docket No. 24),
Veard's Response thereto ("RSUMF") (Docket No. 32), and the evidentiary record as a whole.

1

rate.  Therefore, it is important that F&M makes lending decisions pursuant to the specific investor's guidelines and only closes loans that can be sold.  F&M hired Veard, in an at-will capacity, as a Mortgage Loan Originator ("MLO") in June of 2010 in its Hendersonville, Tennessee office.  The MLO is essentially the salesman of the mortgage team; he is paid a commission for the loans that he originates and F&M closes.  Veard reported to Branch Manager Brian Maggart ("Maggart"), who reported to the Mortgage Department's Operations Manager, Denise Alexander ("Alexander").  Alexander, in turn, reported to Chief Financial Officer DeWayne Olive ("Olive").  Mr. Olive's wife ("Mrs. Olive") was the head of Human Resources. Amanda Dean ("Dean") was the Mortgage Department's Compliance Officer.

As an MLO, Veard was responsible for originating loans and securing initial documentation from the loan customer.  After securing the initial documentation from the customer, the next step in the lending process is for the MLO to submit the customer's file to a Loan Processor.  After conducting the necessary due diligence, the Loan Processor is then required to submit the file to an Underwriter for a decision on the loan.  The Underwriter is responsible for deciding whether an investor is likely to purchase the loan based on the specific investor's underwriting guidelines.  The Underwriter may approve the loan and clear it to close, approve the loan with conditions, suspend the loan, or deny the loan.  If the Underwriter approves the loan with conditions, those conditions must be complied with before the loan can be approved and cleared to close.  If the conditions are not met, the loan is denied.  The Underwriter does not make the determination to purchase the loan for the investor.

In the fall of 2013, Dean and Alexander held a meeting with the MLOs and Loan Processors at the Hendersonville branch. During the meeting, Veard inquired as to whether, pursuant to governing mortgage laws, F&M was supposed to be mailing "Adverse Action Notices" to individuals whose loan applications were denied. Dean responded, "well, we're supposed to be." More specifically, she explained that the compliance department, the Underwriter on the file, or the Loan Processor was supposed to send them. Following the meeting, Veard asked Alexander what would happen if F&M was not sending out Adverse Action Notices. According to Veard, Alexander responded, "well, it wouldn't be good." (Docket No. 26 at p. 50.) Dean expressly denies that Veard ever discussed Adverse Action Notices with her beyond this meeting. Veard also spoke with Maggart about the Adverse Action Notices. Maggart, who also served as a Loan Processor, told Veard that he personally did not always send out Adverse Action Notices.

In November of 2013, Veard assisted a husband and wife, the Smiths,[2] with a loan application. Veard thought the loan should be approved. After Veard passed along the file, Underwriter Kelly Pachachi ("Pachachi") sent the file back with conditions, seeking more information about a "cancellation of debt" appearing on the borrowers' personal tax returns. After Pachachi received more information from the borrowers' accountant, she determined that F&M should deny the application. The cancellation of debt was the result of Mr. Smith's twenty-percent ownership in his family's LLC (the "LLC") that had defaulted on a $3.6 million property loan with BancorpSouth and was subject to foreclosure. The cancellation of debt that the Smiths

_____

[2] The court continues the parties' use of a fictitious name to protect the borrower under federal privacy laws.

reported on their tax returns was twenty percent of the value of the real property and excused the Smiths from paying as much in taxes that year.

Veard did not agree with F&M's decision to deny the Smiths' loan. He argued that, because the LLC, not the Smiths, was the borrower on the foreclosed property, the Smiths could not be held personally liable.[3] Therefore, he contended, F&M was denying the loan for a false and inaccurate reason. Nevertheless, F&M still believed that the cancellation of debt rendered the Smiths an unacceptable credit risk under lending guidelines. Veard believed that Alexander was the driving force behind Pachachi's denial. He did not agree with the decision, and he continually pushed Maggart, Alexander, Pachachi, and Dean to approve the loan. During this time, the Smiths kept contacting Veard to ask for their loan to be closed.

Around the same time, Maggart asked Veard to send the Smiths' loan file to one of F&M's investors, JP Morgan Chase Bank ("Chase"), to see if it would purchase the loan from F&M. Veard did so. Chase advised that it would purchase the loan. Alexander emailed Chase an IRS Form 1099 that she believed reflected that Mr. Smith was personally responsible for the foreclosure because he was twenty percent owner of the LLC and his twenty percent share of the default was reported to his advantage on his personal tax return. Veard believed this was an incorrect representation. In response, Chase advised that, given those circumstances, it would not make the loan purchase. Veard continued to argue that "the borrower" was the LLC. He believed that Mr. Smith was only a small minority partner in the LLC who had not guaranteed the

_____

[3] At this point, Maggart agreed with Veard that F&M should proceed with the Smiths' loan, but he also recognized that the Smiths had received the benefit of the LLC, which was responsible for the foreclosure. Maggart has also testified that it did not matter what he thought; it mattered what Pachachi and Alexander thought.

defaulted loan and, therefore, Veard did not understand why Alexander had made what he believed to be a false representation to Chase regarding the Form 1099 and the cancellation of debt.

On December 11, 2013, Veard sent an email to David Thomas ("Thomas"), F&M's Director of Credit Administration, with Maggart's and Bank Branch Manager Brad Edwards' ("Edwards") permission. He explained the issues regarding the foreclosure against the LLC and stated, "I talked to an attorney today" and, "since they were not obligated on the loan for the property, that is not considered a foreclosure against them personally. Also, irs.gov says the same thing. . . . I also spoke to Brad Edwards about this situation and he said the same thing that the attorney said." Veard then sent Alexander an email stating, "If we are denying this loan, what is the reason for denial??? If it is because of a foreclosure, then we are denying him for a reason that doesn't exist. I spoke to a tax attorney today and he said that there is no possible way that the foreclosure of that property goes against our borrower personally. He said he would be happy to give us a letter stating that." Veard also provided Alexander letters from Bancorp South, the bank that had executed the LLC foreclosure, and a CPA, stating that the Smiths were not liable for any debt incurred by the LLC.

Alexander remained consistent. She held to the belief that, if the Smiths were not responsible for the default, they would not have reported a cancellation of debt to their personal benefit on their personal tax returns.[4] On December 12, 2013, she sent an email to Veard, Maggart, and Pachachi stating, "If our borrower was not responsible [for the foreclosure] it would not have been on his tax return. I am not discussing this again. Do NOT email David

_____

[4] Three other banking institutions also told F&M that they would not be able to close the Smiths' loan, given the circumstances. (*See* Docket No. 26 at pp. 116-19.)

Thomas." Alexander has testified that she intended this email to put Veard on notice that he should cease pursuit of the Smiths' loan. Alexander does admit that Veard, Maggart, and Pachachi continued to discuss the Smiths' loan immediately thereafter, but that that was her choice as the supervisor. Other than the December 12 email, neither Alexander nor Maggart has testified that they ever explicitly told Veard to stop working on the Smith loan file. In response to the December 12 email, Pachachi privately asked Alexander, "Do we need to decline [the loan] at this point?" Alexander responded, "I am still working on getting my blood pressure down" and, "Yes. But wait." Pachachi asked her, "And I wasn't sure, who is David Thomas?" Alexander responded, "David is right under [F&M President] Sammy [Stuard] at the bank."

On December 15, 2013, Veard emailed Pachachi, at Mr. Smith's request, asking for a copy of the letter of denial and a copy of the proof that F&M had counted the foreclosure against him personally. The next day, he emailed Dean, stating, "I need to know exactly what to tell my borrower is the reason we are denying his loan" and provided information supporting his belief that Alexander's denial was improper. Veard concluded, "[s]o [Mr. Smith's] question, and mine, is how do we deny him for something he didn't have?" Dean forwarded his email to Alexander and asked, "[d]o I need to respond to Ed [Veard]?" Alexander replied, "no."

F&M officially denied the Smiths' loan on December 16, 2013. A letter of denial was sent to the Smiths. Despite the denial, Veard did not stop pursuing the loan. At one point, Veard suggested that F&M not disclose the tax returns evidencing the cancellation of debt to the investor. Alexander responded "Ed, we have knowledge so we are not ignoring." Veard went to Dean to discuss documentation he had received from BancorpSouth and the Smiths' accountant and pressed the case for approval of the Smiths' loan. According to Veard's deposition testimony, he raised two issues in his meeting with Dean. First, Veard reiterated his question

from the fall meeting regarding the sending out of Adverse Action Notices. Veard claims that he

stated "We could be liable and I don't want to be liable for this. I mean, this is something that we

should be doing and if we're supposed to be doing it, we need to be told." (Docket No. 26 at p.

76.) Veard testified that he was worried that the bank could be exposed to private lawsuits under

the banking laws for not sending out Adverse Action Notices.[5] Dean has expressly denied that

Veard raised the issue of Adverse Action Notices in this meeting.[6] Second, Veard avers that he

complained about what he believed was the "false and inaccurate" reason that Alexander had

denied the Smiths' loan. However, Dean testified that she did not recall Veard raising a question

as to the *legality* of F&M's loan denial action.

On December 19, 2013, Veard forwarded to Alexander a response to an inquiry he had

sent to Chase and advised Alexander that "Chase is saying they have no problem with the

[c]ancellation of [d]ebt. . . . I don't understand how we can deny him for something that our laws

protect him against. [Mr. Smith] sent me the following excerpt that his attorney sent him from

the irs.gov." Veard re-stated his belief that Mr. Smith was not personally liable and that the

accountant, the tax attorney, and the bank had all confirmed this. Receiving no response from

Alexander, Veard advised her that Mr. Smith "wanted to discuss this." In an effort to help the

Smiths, Alexander told Mr. Smith on December 20, 2013 that she would be willing to contact

U.S. Bank to see if it would consider underwriting the loan directly. Mr. Smith told Alexander

that he would speak to his wife and think about her offer but that they would likely not accept it.

---

[5] Supported only by his own deposition testimony, Veard avers that he asked Dean if he should contact F&M's corporate attorney about matters including the Adverse Action Notices and that Dean said he should not.

[6] This disputed fact is immaterial, given the court's discussion of *Haynes v. Formac Stables, infra.*

The Smiths never contacted Alexander about this again.

On January 15, 2014, without Alexander's knowledge, in response to a request by Mr. Smith, Veard opened a new loan number, created a new file, and submitted the loan documents from the Smiths' November 2013 denied file to U.S. Bank. By doing so, Veard undisputedly did not follow the protocol that is supposed to occur when a new loan file is created. Setting aside new loan file protocol, Veard disputes that he then submitted this file to U.S. Bank without permission. He relies on (1) Alexander's general December offer to Mr. Smith to submit the file to U.S. Bank and (2) his own unrebutted deposition testimony that he informed Maggart that he was submitting the file and that Maggart did not stop him from doing so. It is also undisputed that F&M does not have an explicit policy prohibiting someone such as Veard from being the one to send files directly to investors for underwriting.

Later on January 15, Alexander learned from Maggart that Veard had uploaded the Smiths' file to U.S. Bank.[7] At 9:40 a.m. the next morning, Alexander sent an email to Olive about the "issues with Ed [Veard]." The email explains the history of Veard's involvement with the Smiths' loan file to Olive and expresses Alexander's concerns about Veard's escalating behavior. Alexander discusses Veard's "emailing investors, talking to everyone in the office and even sen[ding] David Thomas an email going around me. . . ." Finally, Alexander states in the email that she fears Veard "has become a [l]ender [l]iability" that F&M "cannot control" and

---

[7] Veard disputes the timing of this asserted fact but offers no record citation other than Alexander's admission that she did not learn of the submission by reading emails about the sending out of packages from the F&M office. Veard does not adduce any facts to dispute Alexander's deposition testimony about her conversation with Maggart.

cites Veard's "desperate personality."[8]  Alexander also contacted U.S. Bank to alert them that the Smiths' file had not gone through the normal F&M channels.

Olive and Alexander subsequently had an approximately thirty-minute-long telephone conversation about Veard.  The unrebutted testimony of Alexander and Olive establishes that Alexander spoke with Olive about what she perceived to be the insubordinate actions of Veard regarding the Smith loan file, including submission of the file to U.S. Bank.  Alexander testified that she told Olive that she (1) "had made a decision on a file and [Veard] would not accept it and would not accept it to the borrower" and (2) Veard had continued to work on the Smiths' file after being told not to do so.  (Docket No. 28 at p. 51.)  Both Alexander and, at the conclusion of this conversation, Olive, believed that Veard's conduct in uploading the second file to U.S. Bank was a breach of protocol and could jeopardize F&M's bonding coverage.  Olive also concluded that Veard's general conduct *vis a vis* Alexander was insubordinate.  Alexander recommended to Olive that Veard be terminated.

Olive agreed and terminated Veard on January 17, 2014.  Mrs. Olive participated in the termination.  Olive admits that he based his termination decision exclusively on information he received from Alexander,[9] and he did not review Veard's case for the approval of the Smiths' loan.  Mrs. Olive has testified that Olive told her that Veard was being discharged for insubordination to Alexander (for continuing to work on the Smiths' loan after being told to let it go) and for not following the proper procedures in submitting the Smiths' loan file to U.S. Bank,

---

[8] F&M has adduced testimony that Veard was under personal financial pressure in December of 2013.

[9] Maggart confirmed to Veard that Alexander was the driving force behind Olive's decision.

as he did so in violation of company policy.  Mrs. Olive completed a Tennessee Department of

Labor Separation Notice on January 16, 2014, stating that Veard was terminated due to

insubordination.[10]  Mrs. Olive has testified that she felt that explanation was of sufficient detail.

Olive advised Veard of his termination for insubordination by telephone.  According to Veard,

when he denied being insubordinate and asserted that no one had told him to stop working on the

Smiths' file, Olive stated that he believed "it was best to just part ways."

Also on January 17, 2014, U.S. Bank, which had independently performed an

underwriting analysis of the Smith file, sent it back to F&M with conditions.  Alexander did not

notify the Smiths of these conditions or take action regarding them because, according to her

testimony, she believed the Smiths were then working to close their loan with Academy

Mortgage, another lender.  Alexander also testified that, "within a month," she called U.S. Bank

and told them to cancel the file because it had not been uploaded properly and that no Adverse

Action Notice was sent out to the Smiths because the second file was canceled rather than

---

[10] On February 12, 2014, F&M again represented to the TDOL that Veard was discharged
for "[i]nsubordination to manager," referring to Alexander.  (Docket No. 39-1 at pp. 49-54.)
F&M submitted a statement saying:

>   At the end of November, 2013, Mr.Veard (secondary market/mortgage
>   loan originator) had a customer loan denied by the Mortgage Division
>   Manager.  The Mortgage Division Manager made her decision based on
>   the company's proper credit procedures.  Mr. Veard did not agree with the
>   Manager and began emailing investors, having discussions with other
>   employees as well as the Bank's Director of Credit Administration.  All of
>   these discussions took place prior to and without his Manager's
>   knowledge.  Mr. Veard refused to accept his Manager's decision and
>   continued to send emails to her as well as the investor, all of which
>   continued through January. Mr. Veard was told repeatedly the loan was
>   denied.

(*Id*. at p. 6.)

denied.[11]

Veard did not receive any progressive disciplinary action before being discharged.
F&M has a written progressive discipline policy and has written up other Mortgage Division
employees for offenses *other than insubordination*, rather than terminating them.  For example, it
issued Greg Haag, an MLO under Alexander and Maggart at Hendersonville, a Progressive
Disciplinary Report ("PDR") for "[v]iolation of Policy 7.01 – Rules of Conduct, 7.04 –
Harassment, Inappropriate verbal comments made to co-worker and outside individuals."
(Docket No. 39-1 at p. 55.)  Haag, who had made unwelcome and offensive sex-related
comments to a female co-worker, continues to work at F&M.  Mr. Olive also issued a PDR to
Shawn Ireland at Hendersonville for "[t]hreatening, intimidating employees; use of abusive and
vulgar language; set-up of unauthorized web site on bank equipment.  All actions detrimental to
the orderly conduct of business."  (*Id*. at p. 64.)

The F&M Employee Handbook's ("Handbook") Rules of Conduct state that "the
employment relationship may be terminated at anytime by either the employee or F&M Bank for
any reason not expressly prohibited by law."  (Docket No. 39-1 at p. 24.)  The Handbook
contains a non-exhaustive list of impermissible conduct, which includes "[i]nsubordination:
includ[ing] refusal to follow instructions of authorized personnel, refusal or failure to perform
assigned work, rude or discourteous conduct."  (*Id*. at p. 25.)  The Handbook's Disciplinary
Guidelines provide four steps of progressive discipline, the fourth of which is "employee

_____

[11] The Smiths subsequently obtained their loan from Academy Mortgage and it was
purchased by Wells Fargo.

termination." (Docket No. 39-1 at p. 35.) Section 7.09 states that, while F&M "may provide" an employee an opportunity to correct deficiencies, it may also "eliminate or accelerate any of these procedures." (*Id*.) Therefore, under the progressive discipline policy, F&M has the discretion to move directly to employee termination.

On April 29, 2015, Veard filed the Complaint in this action (Docket No. 1), which brings two claims against F&M: (1) retaliatory discharge under Tennessee common law and (2) retaliatory discharge under the Consumer Financial Protection Act of 2010, 12 U.S.C. § 5567 ("CFPA").

F&M filed its Motion for Summary Judgment on December 11, 2015. (Docket No. 22.) On January 19, 2016, Veard filed his Response. (Docket No. 43.) On January 25, 2016, F&M filed its Reply. (Docket No. 44.)

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## ANALYSIS

## I.     Tennessee Common Law Retaliation Claim

In Tennessee, the employee-employer relationship is ordinarily governed by the employment-at-will doctrine, "a long standing rule . . . which recognizes the concomitant right of either the employer or the employee to terminate the employment relationship at any time, for good cause, bad cause, or no cause at all, without being guilty of a legal wrong." *Stein v. Davidson Hotel Co.*, 945 S.W.2d 714, 716 (Tenn. 1997). In *Clanton v. Cain-Sloan Co.*, the Tennessee Supreme Court recognized an exception to the employment-at-will doctrine in the form of a common law cause of action for retaliatory discharge. 677 S.W.2d 441, 445 (Tenn. 1984). While the claim in *Clanton* concerned an allegation that the employer had discharged an employee for filing a workers' compensation claim, *id.* at 443, the court later clarified that an employee may recover for retaliatory discharge in a variety of different contexts by establishing the following elements:

> (1) that an employment-at-will relationship existed; (2) that the employee
> was discharged[;] (3) that the reason for the discharge was that the
> employee attempted to exercise a statutory or constitutional right, or for
> any other reason which violates a clear public policy evidenced by an

13

>unambiguous constitutional, statutory, or regulatory provision; and (4) that a substantial factor in the employer's decision to discharge the employee was the employee's exercise of protected rights or compliance with clear public policy.

*Crews v. Buckman Labs. Int'l, Inc.*, 78 S.W.3d 852, 862 (Tenn. 2002). One of the factual scenarios that will support a common law cause of action for retaliatory discharge is when an employee is discharged for refusing to remain silent about his employer's illegal activity or unsafe practices – commonly referred to as a "whistleblower" claim. *Gossett v. Tractor Supply Co.*, 320 S.W.3d 777, 787 (Tenn. 2010) (citing *Anderson v. Standard Register Co.*, 857 S.W.2d 555, 556 (Tenn. 1993)).

To prevail on a whistleblower claim at common law, an employee must establish that he or she reported the employer's illegal activity and that the "reporting of the illegal activity furthered a clear public policy." *Id.* at 788. Furthermore, the Tennessee Supreme Court has recently confirmed that "the public policy underlying the whistleblower protections precludes relief for an employee who merely reports unlawful activity to the person responsible, even when that person is the manager, owner, or highest authority within the company." *Haynes v. Formac Stables, Inc.*, 463 S.W.3d 34, 40 (Tenn. 2015). The court acknowledged that this holding might, in certain circumstances, eliminate the option of internal reporting and require reporting to an outside agency. *Id.* at 40-41.

F&M first contends that it is entitled to summary judgment under *Haynes* because Veard only complained to his supervisor within the mortgage department. F&M contends that there is no evidence that Veard ever reported any of his alleged complaints "outside of F&M or to F&M's CEO, CFO, legal counsel, human resources, or whistleblower hotline." (Docket No. 23 at p. 8.) The undisputed evidence establishes that this is true. Veard alleges that he was

14

terminated in retaliation for allegedly (1) making inquiries about whether F&M was sending

Adverse Action Notices and (2) challenging F&M's denial of the Smiths' loan. Giving Veard

the benefit of the doubt, the only individuals to whom he raised these concerns were Alexander,

the Operations Manager of the Mortgage Department, and Amanda Dean, the Compliance

Officer of the Mortgage Department, the individuals responsible for ensuring that F&M

complied with federal lending laws. Veard did not bring his concerns outside the Mortgage

Department and thus, under *Haynes*, did not "blow the whistle" to anyone in a manner sufficient

to support a retaliatory discharge claim. *Haynes*, 463 S.W.3d at 38-39; *see also Simon v. Enest*

*Tubb Record Shop, Inc.*, No. 3-10-1082, 2012 WL 5388921, *3 (M.D. Tenn. Nov. 2, 2012)

(dismissing claim under Tennessee common law because plaintiff had not complained to anyone

other than boss and company's attorney) (citing *Smith v. C.R. Bard, Inc.*, 730 F.Supp.2d 783,

797 (M.D. Tenn. 2010) (noting that, under Tennessee law, "[t]o show that persons were

discriminated against for refusing to be silent about illegal activities, plaintiffs must also show

that they made a report to some entity other than the person or persons who are engaging in the

allegedly illegal activities")).

Veard attempts to escape this conclusion by responding that he "exposed" Alexander's

conduct internally to Maggart, Edwards, and Thomas and externally to Mr. Smith,

BancorpSouth, Mr. Smith's accountant, a tax attorney, Chase, and Wells Fargo. This is,

however, a mischaracterization of the record. First, Maggart and Edwards were merely

colleagues of Veard's in the Mortgage Department – who also worked at times on the Smiths'

loan – and, therefore, reporting to them does not qualify under *Haynes*. Second, Veard merely

sent Thomas, who was admittedly above Alexander in the chain of command, an email that

stated "I talked to an attorney today" and, "since they were not obligated on the loan for the property, that is not considered a foreclosure against them personally. Also, irs.gov says the same thing. . . . I also spoke to Brad Edwards about this situation and he said the same thing that the attorney said." This communication, arguing for approval of the Smiths' loan, simply does not raise the spectre of illegality. Next, Veard communicated with Mr. Smith, the Smith's accountant, BancorpSouth, and the tax attorney regarding the cancellation of debt. There is likewise no evidence that Veard was reporting illegal activity to them, as opposed to gathering information and discussing Mr. Smith's tax situation. Finally, Veard asked the help desks of Chase and Wells Fargo hypothetical scenarios about whether they would approve a loan similar to the Smiths' file; but he never submitted any actual loan file or application to them or, more importantly, brought any concerns about illegal activity to their attention.

In sum, Veard offers no evidence of outside reporting concerning the Advance Action Notices at all. The evidence of outside conversations relevant to F&M's internal consideration of the Smiths' loan shows that these conversations were insufficient to bring any purported illegal activity at F&M to the attention of those outside individuals. Accordingly, Veard's common law retaliatory discharge claim will be dismissed.

## II.    CFPA Retaliation Claim

The CFPA provides, in relevant part: "No covered person or service provider shall terminate . . . any covered employee . . . by reason of the fact that such employee . . . has . . . objected to, or refused to participate in, any activity, policy, practice, or assigned task that the employee . . . reasonably believed to be in violation of any law, rule, order, standard, or prohibition, subject to the jurisdiction of, or enforceable by, the [Consumer Financial Protection

16

Bureau]." 12 U.S.C. § 5567(a)(4). In order to establish a *prima facie* case under the CFPA,

Veard has the burden of showing he engaged in a protected activity. "The employer may then

avoid liability if it proves 'by clear and convincing evidence that the employer would have taken

the same personnel action in the absence of the protected activity.'" *Rhinehimer v. U.S. Bancorp*

*Investments, Inc.*, 787 F.3d 797, 805 (6th Cir. 2015) (quoting *Feldman v. Law Enforcement*

*Associates Corp.*, 752 F.3d 339, 345 (4th Cir. 2014)).

Veard alleges that he engaged in protected activity as defined by sections (1) and (4) of

12 U.S.C. § 5567(a). In order to have engaged in "protected activity" under these sections,

Veard must show that he:

> (1) provided, caused to be provided, or is about to provide or cause to be
> provided, information to the employer . . . relating to any violation of, or
> any act or omission that the employee reasonably believes to be a
> violation of, any provision of this title or any other provision of law that is
> subject to the jurisdiction of the [CFPB], or any rule, order, standard, or
> prohibition prescribed by the [CFPB] . . .
>
> or
>
> (4) objected to, or refused to participate in, any activity, policy, practice,
> or assigned task that the employee (or other such person) reasonably
> believed to be in violation of any law, rule, order, standard, or prohibition,
> subject to the jurisdiction of, or enforceable by, the [CFPB].

12 U.S.C. § 5567(a).

The record does not establish that Veard engaged in a protected activity under these

sections. When Veard inquired at the meeting whether F&M was supposed to be sending out

Adverse Action Notices, it was merely a question, not a complaint about specific behavior.

Moreover, Veard was told by Dean that F&M *was* "supposed to be" sending Adverse Action

Notices. At the same meeting, he was also told by Alexander that it would *not* be good if the

sending out of notices failed to occur. In other words, he was told by F&M that compliance, as opposed to lack of compliance, with mortgage regulations was desirable. As discussed above, there is no evidence that Veard complained about failure to send Adverse Action Notices to Olive or other senior managers at F&M, or to anyone outside the bank, and so he could not have been engaged in protected activity regarding that subject with anyone else of authority. In sum, Veard inquired about an activity governed by mortgage laws and was told F&M seeks to comply with those laws. Accordingly, Veard has not engaged in protected activity under the CFPA regarding his questions concerning Adverse Action Notices.

There is also no evidence that Veard engaged in protected activity as defined by the CFPA with respect to the denial of the Smiths' loan. Veard must show that he believed F&M's conduct was a violation of the CFPA *and* that a reasonable person in his position would have believed F&M's conduct constituted such a violation.[12] *See Walton v. Nova Info. Sys.*, No. 3:06-CV-2922008 WL 1751525, at *8 (E.D. Tenn. Apr. 11, 2008) (citing *Livingston v. Wyeth*, No. 06-1939, 2008 WL 756068, at *8 (4th Cir. Mar. 24, 2008)). In other words, Veard must satisfy both a subjective and an objective standard. In *Rhinehimer*, a retaliation case brought under the Sarbanes-Oxley Act, the court held that:

> [T]he complainant need only show that he or she reasonably believes that the conduct complained of constitutes a violation of the enumerated laws. . . . As the term itself indicates, reasonable belief involves both a subjective component and an objective component. . . . The subjective component is satisfied if the employee actually believed that the conduct complained of constituted a violation of relevant law. . . . Objective reasonableness is

---

[12] Given the lack of caselaw interpreting the CFPA, the parties have briefed their arguments utilizing the closely analogous and nearly identical Sarbanes-Oxley Act, 18 U.S.C. § 1514A (2010). The court agrees that there is support in the similarities of these statutes and regulations for doing so.

evaluated based on the knowledge available to a reasonable person in the same factual circumstances with the same training and experience as the aggrieved employee.

787 F.3d at 811 (citing *Nielsen v. AECOM Tech. Corp.*, 762 F.3d 214, 221 (2nd Cir. 2014) and

*Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009)).  The court continued:

> [T]he issue of objective reasonableness should be decided as a matter of law only when no reasonable person could have believed that the facts [known to the employee] amounted to a violation or otherwise justified the employee's belief that illegal conduct was occurring. . . . If, on the other hand, reasonable minds could disagree about whether the employee's belief was objectively reasonable, the issue cannot be decided as a matter of law. . . . In accordance with our discussion above, an employee need not establish the reasonableness of his or her belief as to each element of the violation. Instead, the reasonableness of the employee's belief will depend on the totality of the circumstances known (or reasonably albeit mistakenly perceived) by the employee at the time of the complaint, analyzed in light of the employee's training and experience.

*Id*. at 811-12  (citing *Wiest v. Lynch*, 710 F.3d 121, 135 (3rd Cir. 2013) (internal quotation marks

omitted)).

Veard has convinced the court that he actually believed that F&M was acting illegally

regarding the Smiths' loan, although he has not made it clear exactly how he believed this was

the case.  Taken generously, this satisfies the subjective component of this standard.  However,

Veard cannot satisfy the objective component.  Veard has brought no element of the CFPA to the

attention of the court that *required* F&M to grant the Smiths a loan where the only question at

issue was creditworthiness.  F&M was, therefore, entitled to make its own underwriting

decisions as to the wisdom of lending to a borrower with a perceived credit risk, and Veard has

not explained how it was illegal for F&M to decline a loan in its discretion on that basis (even if

that discretion turned out to be based upon an ill-conceived understanding of tax law or policy).

Veard's deposition testimony reveals that he had a singular, unreasonable focus on closing the

Smiths' loan, to the exclusion of all else and all opinions to the contrary (including those of three other financial institutions that agreed with F&M that the Smiths were a credit risk). However, Veard's disagreement with his superiors does not make their decisionmaking "illegal" and does not alone transform the subjective unprotected activity of his particularly emphatic dissatisfaction into an objectively reasonable protected one. The court finds that a reasonable MLO could not have believed that the facts known to Veard concerning the Smiths' loan amounted to a violation of the FCPA or otherwise justified his belief that illegal conduct was occurring. More specifically, the court finds that, on this evidentiary record, no objectively reasonable MLO would have believed that the denial of the Smiths' loan due to the presence of the cancellation of debt on Mr. Smith's personal tax returns was a violation of the CFPA, as opposed to merely a (potentially misguided) creditworthiness business decision. Though Veard's desire to close the Smiths' loan may have locked his own vision in to a certain viewpoint, it does not mean that an objectively reasonable MLO could believe the denial was unlawful. Based on the totality of the circumstances, in this circumstance, this conclusion must be reached as a matter of law.[13]

Even if Veard had made out a *prima facie* case under the CFPA, his claim would fail because F&M has offered clear and convincing evidence that it would have terminated his employment in the absence of any protected activity. *Walton*, 2008 WL 1751525, at *7 (noting that, once the employer satisfies its clear and convincing evidence burden, the claim fails and the

---

[13] Veard makes a very limited argument to the contrary regarding the objective standard, but the argument he makes is unpersuasive: he essentially contends that his subjectively reasonable beliefs do double duty for the objective prong and that, thus, "Veard's beliefs were facts" with which an objectively reasonable person simply can agree and, thereby, defeat summary judgment. (Docket No. 43 at p. 21.) This inappropriately conflates the two standards.

inquiry ends, unlike the *McDonnell Douglas* burden-shifting framework).  There is very little

debate here as to the sequence of events.  Veard relentlessly pursued the Smiths' loan.

Alexander sent an (angry) email on December 12, 2013, stating that she did not wish to discuss

the matter further.  Veard continued to pursue and press the matter.  F&M denied the Smiths'

loan at Alexander's direction in mid-December.  In mid-January, without notifying Alexander or

seeking her approval,[14] and without following F&M's standard protocols (although with the

knowledge of his colleague Maggart), Veard opened a new loan file for the Smiths and sent it to

U.S. Bank.  When Alexander learned of these actions, she immediately contacted Olive, by email

and then by telephone, to discuss the sequence of events and recent history with Veard.  She

expressed concerns that his insubordinate behavior had put F&M's bonding coverage at risk.

Olive came to the conclusion that Veard had been insubordinate to Alexander and agreed with

Alexander's recommendation to terminate Veard.  The court finds the record, as summarized

here, to contain clear and convincing evidence of (1) Veard's insubordination[15] and (2) Olive's

---

[14] Veard contends that he had Alexander's approval because Alexander had offered to send the file to U.S. Bank for Mr. Smith in December, and Mr. Smith asked Veard to pursue the matter in January.  Regardless, however, of what Mr. Smith asked Veard to do in January, F&M had denied and closed the Smiths' file and had protocols in place for opening and pursuing a new file that Veard chose not to follow in January.  It is also undisputed that, whatever Mr. Smith asked Veard to do, and whatever Veard did, he did without informing or seeking the permission of Alexander, despite knowing (1) Alexander's attitude and direction regarding the cancellation of debt and the Smiths' creditworthiness and (2) that Alexander had been the personally-involved decisionmaker on the Smiths' file in December.

[15] The employer has leeway to evaluate Veard in its business judgment, and the record supports this conclusion.  *See McConnell v. Swifty Transp., Inc.*, 198 F. Appx. 438, 443 (6th Cir. 2006) ("Importantly we must not second guess the business judgment of the employer, but simply evaluate 'whether the employer gave an honest explanation for its behavior.'") (citing *Hedrick v. Western Reserve Care Sys.*, 355 F.3d 444, 462 (6th Cir. 2004) ("As we have oft times repeated, it is inappropriate for the judiciary to substitute its judgment for that of management.") (internal quotation marks and citation omitted)); see also *Riddle v. First Tenn. Bank, Nat'l Ass'n*,

reliance on Veard's insubordination in making the decision to terminate Veard. Olive was not required to explain all of his rationale to Veard when he terminated his at-will employment. On this record, it was adequately summarized as being for "insubordination." F&M was entitled to escalate its treatment of Veard for insubordination to termination under its progressive discipline policy. F&M is entitled to summary judgment on this claim.

## CONCLUSION

F&M's Motion for Summary Judgment (Docket No. 23 ) will be granted.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge

---

497 F. Appx. 588, 596 (6th Cir. 2012) (rejecting the plaintiff's invitation to sit as a "super-personnel department" to undermine the employer's clear and convincing evidence that it would have terminated the plaintiff in the absence of any alleged protected activity)